# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PATRICE M. WITZKE,

     Plaintiff,                     Case No. 13-14379

v.                                 Hon. Gerald E. Rosen

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____April 4, 2016_____

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

## I.  INTRODUCTION

Plaintiff Patrice M. Witzke commenced this action in this Court on October 17, 2013, challenging the final decision of the Defendant Commissioner of Social Security to deny Plaintiff's application for disability insurance benefits under the Social Security Act (the "Act").  This Court's subject matter jurisdiction rests upon Plaintiff's assertion of the right of judicial review conferred under the Act. *See* 42 U.S.C. § 405(g).

Through the present cross-motions, Plaintiff and Defendant request that the Court reverse or affirm, respectively, the decision of an Administrative Law Judge following a hearing that Plaintiff was not disabled within the meaning of the Act as of December 31, 2003, the date she was last insured for disability insurance benefits. Having reviewed the parties' motions and accompanying briefs, Plaintiff's reply brief, and the underlying administrative record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

**A.  Procedural History**

As Plaintiff aptly observes, this case has a lengthy and somewhat complex procedural history. In May of 2007, Plaintiff Patrice M. Witzke filed concurrent applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Act, alleging a disability onset date of August 1, 2002.

(*See* Admin. Record ("AR") at 215-26.)[1]  Following the initial denials of these applications in July of 2007, (*see id.* at 133-37, 138-41), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), (*see id.* at 144).

On August 12, 2009, Plaintiff appeared with counsel at an administrative hearing before ALJ Peter N. Dowd.  (*See id.* at 74-113.)  On September 24, 2009, ALJ Dowd issued a partially favorable decision, approving Plaintiff's request for SSI benefits as of her application date of May 8, 2007, but denying her application for DIB on the ground that she was capable of performing past relevant work through December 31, 2003, the date on which she was last insured for DIB.  (*See id.* at 118-32.)  Plaintiff pursued an administrative appeal of the latter, unfavorable portion of the ALJ's decision, and the Appeals Council issued a March 15, 2011 order remanding the case to an ALJ for further administrative proceedings concerning the issue of Plaintiff's disability status prior to May 8, 2007.  (*See id.* at 178-80.)[2]

---

[1]As noted by the ALJ, Plaintiff subsequently amended her disability onset date to January 28, 2003.  (*See id.* at 15.)

[2]As observed by the Defendant Commissioner, regardless of the outcome of this remand ordered by the Appeals Council, Plaintiff could not receive SSI benefits for any period prior to May of 2007, when she first applied for these benefits.  Moreover, while the Appeals Council stated that the issue on remand was Plaintiff's disability status prior to May 8, 2007, the ALJ noted upon remand that Plaintiff had to establish that she was disabled on or before her last insured date of December 31, 2003 in order to secure an award of DIB.  (*See id.* at 16.)

3

Following the Appeals Council's order of remand, a second administrative hearing was held on March 20, 2012 before ALJ Craig R. Petersen. (*See id.* at 33-73.) On April 3, 2012, ALJ Petersen issued a decision finding that Plaintiff was not disabled within the meaning of the pertinent provisions of the Act during the period from January 28, 2003 through May 7, 2007, (*see id.* at 12-27),[3] and the Appeals Council thereafter denied Plaintiff's request for administrative review of the ALJ's decision, (*see id.* at 1-5). Through the present suit filed on October 17, 2013, Plaintiff now seeks judicial review of the ALJ's unfavorable decision.

**B.     The Relevant Medical Evidence**

The ALJ determined that Plaintiff suffered from the severe impairments of rheumatoid arthritis, lumbar spine degenerative disc disease, Raynaud's disease, depression, and alcohol dependence. (*See id.* at 18.) As observed by the Defendant Commissioner, however, Plaintiff does not challenge the ALJ's analysis of her mental conditions, so the following summary of the medical record is confined to the evidence bearing on Plaintiff's physical impairments.[4]

---

[3]On April 19, 2012, the ALJ issued a brief amended decision in which he clarified that "the period after May 7, 2007 was outside the scope of" his initial April 3 decision, and that this earlier decision addressed only Plaintiff's disability status from January 28, 2003 through May 7, 2007. (*See id.* at 7-11.)

[4]In addition, because the key question before the ALJ was whether Plaintiff could establish disability on or before her last insured date of December 31, 2003, the Court focuses principally on this time period in its survey of the medical record.

The bulk of the treatment Plaintiff received for her physical impairments during the pertinent period was provided by physicians Mark L. Skory, D.O., and Algimantas Maciulis, M.D.  Dr. Skory's records, while difficult to decipher, reflect regular office visits by Plaintiff from April of 2001 through May of 2005. (*See* AR at 398-402.)  Most notably, a February 7, 2002 entry in Dr. Skory's office notes states that he referred Plaintiff to a specialist, Dr. Maciulis, who Plaintiff had been seeing for joint pain and who had provided "[g]ood relief" through treatment and medications.  (*Id.* at 402.)  Dr. Skory's notes also reflect periodic updates of Plaintiff's course of treatment with Dr. Maciulis, including (i) a May 29, 2003 note that Plaintiff had been receiving treatment from Dr. Maciulis for arthritis, (ii) a June 2, 2003 note that an x-ray ordered by Dr. Maciulis revealed arthritis, and (iii) notes of changes in Plaintiff's medications made by Dr. Maciulis.  (*See id.* at 398-99, 401.)  In addition, Dr. Skory's records include the results of lab work ordered by this physician, including blood tests and urinalyses.  (*See id.* at 404, 408-09, 415.)

The medical record also includes extensive documentation of Plaintiff's treatment by Dr. Maciulis, although the notes from Plaintiff's visits to this physician are, once again, somewhat difficult to read.  On January 28, 2003, Plaintiff visited Dr. Maciulis with a complaint of pain in her right big toe, and Dr.

5

Maciulis diagnosed her with rheumatoid arthritis and prescribed Bextra, an anti-inflammatory medication.  (*Id.* at 531.)  X-rays of Plaintiff's hands and feet were taken this same day, revealing (i) "moderate degenerative arthritis involving the first right metatarsal phalangeal joint" of Plaintiff's right foot, (ii) "markedly advanced degenerative arthritic changes involving the left first metatarsal phalangeal joint" of Plaintiff's left foot, as well as "joint space narrowing and deformity of the head of the left first metatarsal," (iii) mild narrowing of the right and left ankle mortises, (iv) "marked arthritic change of degenerative nature at the first right carpal metacarpal joint" of Plaintiff's right hand, (v) "advanced degenerative arthritis in the left first carpal metacarpal joint" of her left hand, as well as "[a]n erosive osteoarthritis . . . in the distal phalangeal joints of the second, third, fourth and fifth digits" of this hand, (vi) "degenerative arthritis at the right first carpal metacarpal joint" of Plaintiff's right wrist, and (vii) "advanced degenerative arthritis involving the left first carpal metacarpal joint" of her left wrist.  (*Id.* at 535-36.)

On March 11, 2003, Plaintiff visited Dr. Maciulis with complaints of numbness and tingling pain at night in both of her wrists.  (*See id.* at 537.)  Plaintiff was given an injection in her left wrist, was advised to increase the dosage of her medication for a few days, and was diagnosed with rheumatoid

arthritis and carpal tunnel syndrome.  (*See id.*)

Plaintiff next visited Dr. Maciulis on July 29, 2003, complaining of hip pain when getting in or out of her car, but reporting that her medications were helping to control her pain.  (*See id.* at 538.)  An examination of Plaintiff's wrists and hands disclosed Raynaud's phenomenon and Heberden's nodes, and Dr. Maciulis again diagnosed rheumatoid arthritis.  (*See id.*)  Plaintiff was sent for x-rays of her hands, wrists, and spine, which revealed (i) "advanced degenerative arthritic change at the first metacarpal phalangeal joint at the base of each thumb," as well as "joint space narrowing and considerable sclerosis present at these joints," (ii) "considerable degenerative arthritic change in the DIP joint of the hands[,] especially the third, fourth, and fifth on the left and the fifth one on the right," as well as "complete [loss of] joint space" and "considerable sclerosis" in these joints, and (iii) "advanced degenerative change at L4-5" of Plaintiff's lumbar spine, with "disc space narrowing, sclerosis and spurring."  (*Id.* at 540-41.)

On December 22, 2003, Plaintiff appeared at Dr. Maciulis's office complaining of middle foot symptoms with weight bearing or ambulation, increased wrist and hand pain, and hip and lower back pain.  (*See id.* at 545.)  Dr. Maciulis prescribed medications and sent Plaintiff for lab work that revealed an elevated rheumatoid factor and low blood count readings consistent with anemia.

(*See id.* at 545-47.)  X-rays taken at around this same time again showed (i) "narrowing of the first right metatarsal phalangeal joint" of Plaintiff's right foot, "representing moderate degenerative arthritis," (ii) "severe degenerative arthritic changes" in Plaintiff's left foot,  "involving the left first metatarsal phalangeal joint with obliteration of the joint space and hypertrophic spurring," (iii) "significant erosions in the distal portion of the middle phalanx of the fifth digit of the right hand," (iv) "significant erosions . . . in the distal portions of the middle phalanges of the third, fourth and fifth digits of the left hand," and (v) "moderate degenerative arthritic changes . . . at the first and second carpal metacarpal joints of the left wrist."  (*Id.* at 548-49.)

At a visit to Dr. Maciulis in February of 2004, Plaintiff reported "minimal" joint and muscle discomfort, and she identified her "main concern" as numbness and tingling in her wrists at night.  (*Id.* at 550.)  Similarly, Plaintiff advised Dr. Maciulis during a March 29, 2004 visit that she was doing well, with minimal joint and muscle discomfort, and she reported that she had discontinued a medication on her own because she "was doing well."  (*Id.* at 555.)  Lab work conducted during this period revealed a high rheumatoid factor of 67.9, well outside the normal range of 0 to 20.  (*Id.* at 553.)  Likewise, the findings from x-rays taken during this period were consistent with prior reports.  (*See id.* at 554.)

Plaintiff next visited Dr. Maciulis on May 18, 2004, complaining of stiffness in the morning lasting about an hour, and reporting that her sleep was not restful. (*See id.* at 557.) Dr. Maciulis again recommended that Plaintiff increase her dosage of Bextra for a few days, and also discontinued one of her medications (Elavil) while prescribing another (Pamelor). (*See id.*)

Apart from these visits to her treating physicians, Plaintiff also underwent an October 14, 2002 examination by Dr. Joseph L. Craig, Jr. on behalf of the State of Michigan's Disability Determination Service. (*See id.* at 383-36.) Dr. Craig found that Plaintiff could perform tasks requiring fine and gross dexterity, such as opening a door, making a fist, picking up a coin or a pencil, and writing, although she complained of wrist pain during these activities. (*See id.* at 385.) He further reported that Plaintiff had "mild antalgic gait patterns," that her gait was "slow and cautious," and that she "require[d] use of a cane to assist her with transfers and mobility." (*Id.*) In addition, Plaintiff was unable to "perform he[e]l walking, heel to toe walking and toe to heel walking," nor could she "squat []or recover from the squat position." (*Id.*) Plaintiff also exhibited tenderness to palpation throughout her shoulder region and in her lumbosacral spine, as well as "pause of crepitus" during testing of the range of motion in her knees. (*Id.* at 385-86.) Dr. Craig diagnosed rheumatoid arthritis, Raynaud's disease, osteoarthritis, back pain, and

myopathic pain syndrome.  (*Id.* at 386.)

Finally, the relevant medical record includes two physician assessments of Plaintiff's physical limitations.  First, in a questionnaire completed on April 7, 2004 at the request of the State of Michigan's Family Independence Agency, Plaintiff's treating physician, Dr. Skory, opined that Plaintiff could occasionally lift up to ten pounds, could "intermit[tently]" stand, walk, and sit for two to three hours each per day, and could perform simple grasping, reaching, and fine manipulation but not pushing or pulling.  (*Id.* at 588.)  Dr. Skory further stated that he had examined Plaintiff on March 25, 2004, and he identified Plaintiff's current diagnoses as rheumatoid arthritis, anxiety disorder, and recovering alcoholism. (*See id.* at 587.)  In a portion of the questionnaire inquiring about "pertinent abnormal findings," Dr. Skory wrote, "See attached," (*id.*), but the record discloses no such accompanying attachments that would reflect or support Dr. Skory's findings.

Next, Dr. Penput Tangsintanapas sent the State of Michigan's Family Independence Agency an October 14, 2004 report of his examination of Plaintiff. Dr. Tangsintanapas found that Plaintiff exhibited "fair" grip strength, but noted the presence of "Heberden's and Bouchard's nodes at the distal and proximal IP joints of both hands."  (*Id.* at 591.)  The physician further noted that x-rays had

10

revealed "erosive Osteoarthritis at [the] distal joints of the hands and advanced degenerative arthritis at the 1st MTP joints of both feet." (*Id.* at 592.)  Dr. Tangsintanapas opined that Plaintiff suffered from degenerative disc disease at L4-5, and perhaps also inflammatory polyarthritis and early psoriatic arthritis superimposing on erosive osteoarthritis, and Plaintiff was advised (i) not to stand longer than 15 minutes at a time, and for no more than an hour total in an eight-hour day, (ii) to walk only "a short distance for a few minutes at a time, not longer than 15 minutes in 8 hours," (iii) to "sit for a couple of hours with oc[c]asional breaks every 30 minutes as needed," for a total of "at least" six hours in an eight-hour workday, and (iv) to "avoid pushing or pulling any objects over 2 pounds repeatedly [or] . . . lifting any objects over 20 lbs." (*Id.*)

## C.    Plaintiff's Testimony at the Administrative Hearing

At the March 20, 2012 hearing before ALJ Petersen, Plaintiff testified that her rheumatoid arthritis affected her entire body, but that the pain from this condition was most severe in her hands, feet, back, knees, and hips. (*See id.* at 47.)  She stated that in 2003, she could lift and carry an average of ten pounds, stand for a "[c]ouple hours" with some pain, and sit for 45 minutes to an hour. (*Id.* at 53-55.)  Plaintiff further testified that during this time period, she had to elevate her legs three or four times a day, for 15 to 30 minutes every couple of hours, and

11

that she had difficulty using her hands for such tasks as kneading bread, chopping food, using scissors, opening jars, making a fist, combing her hair, tying her shoes, and picking up coins from a table.  (*See id.* at 60-62.)

## D.   The Pertinent Findings of the Administrative Law Judge

In an April 3, 2012 decision, ALJ Petersen determined that between Plaintiff's claimed disability onset date of January 28, 2003 and her last insured date of December 31, 2003, Plaintiff was not disabled within the meaning of the pertinent provisions of the Social Security Act.  (*See id.* at 15-27.)  The ALJ determined that Plaintiff suffered from the severe impairments of rheumatoid arthritis, lumbar spine degenerative disc disease, Raynaud's disease, depression, and alcohol dependence, but found that these impairments did not meet or medically equal the criteria for any impairment listed in the Social Security regulations.  (*See id.* at 18-20.)

The ALJ next assessed Plaintiff's residual functional capacity ("RFC"), determining that Plaintiff could perform a limited range of sedentary work.  In particular, the ALJ imposed the following limitations on Plaintiff's ability to perform sedentary work:  (i) lifting up to ten pounds occasionally, (ii) standing or walking up to six hours (with normal breaks) in an eight-hour workday and sitting up to six hours (with normal breaks) in an eight-hour workday, with the option to

alternate at will between sitting and standing, (iii) occasional stooping, kneeling, crouching, crawling, and climbing ramps or stairs, (iv) no climbing of ladders, ropes, or scaffolds, (v) frequent handling, fingering, and feeling, (vi) occasional bending or twisting at waist level, but no lifting from the ground to waist level, (vii) no concentrated exposure to extreme temperatures, humidity, or wetness, and (viii) a limitation to simple, routine, and repetitive tasks involving simple, work-related decisions and few, if any, workplace changes.  (*See id.* at 20-21.)

Next, the ALJ determined that Plaintiff was unable to perform her past relevant work as a cashier, which the ALJ characterized as a light semiskilled job. (*See id.* at 25.)  In light of the testimony of vocational expert Paul Delmar at the administrative hearing, however, the ALJ found that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. (*See id.* at 26.)  Consequently, the ALJ concluded that Plaintiff was not disabled under the Act during the relevant time period.  (*See id.*)[5]

## III.  <u>ANALYSIS</u>

**A.**    **The Standards Governing the Court's Review of the ALJ's Decision**

---

[5]As noted earlier, the ALJ issued a brief amended decision on April 19, 2012, clarifying that "[t]he correct period of review" for his initial April 3 decision "was from January 28, 2003, through May 7, 2007," and that "the period after May 7, 2007 was outside the scope of" his review.  (*Id.* at 10-11.)

13

Under 42 U.S.C. § 405(g), an applicant for benefits such as Plaintiff here may seek judicial review of a final decision by the Defendant Commissioner of Social Security, and the Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing" the Commissioner's decision.  In conducting this review, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner of Social Security,* 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks and citations omitted).  The requisite "substantial evidence" to support the Commissioner's decision "is defined as more than a scintilla of evidence but less than a preponderance," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). This standard does not demand that "this [C]ourt agree with the Commissioner's finding, as long as it is substantially supported in the record." *Rogers,* 486 F.3d at 241.

In determining whether the Defendant Commissioner's decision is supported by substantial evidence, the Court "do[es] not try the case de novo,

14

resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007).  Rather, it is the task of "the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers,* 486 F.3d at 247.  Moreover, "[w]hile it might be ideal for an ALJ to articulate his reasons for crediting or discrediting" each item in the evidentiary record, there is no requirement that the ALJ "directly address[] in his written decision every piece of evidence submitted by a party." *Kornecky v. Commissioner of Social Security,* No. 04-2171, 167 F. App'x 496, 507-08 (6th Cir. Feb. 9, 2006) (internal quotation marks and citation omitted).  "Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky,* 167 F. App'x at 508 (internal quotation marks and citation omitted).

**B.    The ALJ Did Not Commit Reversible Error by Declining to Give Controlling Weight to the Opinion of Plaintiff's Treating Physician, Dr. Skory.**

As her principal challenge to the ALJ's decision denying her application for disability insurance benefits, Plaintiff contends that the ALJ committed reversible error by failing to give controlling weight to the opinion of her treating physician, Dr. Skory.  Alternatively, even assuming that Dr. Skory's opinion is not entitled to

controlling weight, Plaintiff argues that the ALJ failed to identify sufficient grounds for determining that this opinion should be given only "some weight," (AR at 24), and for making findings as to Plaintiff's residual functional capacity ("RFC") that, in Plaintiff's view, were inconsistent with certain of the limitations found by Dr. Skory.  As discussed below, while the Court agrees that the ALJ's assessment of Dr. Skory's opinion deviated in some respects from the evaluation called for under the pertinent Social Security regulations, it nonetheless concludes that any such error was harmless, where the RFC adopted by the ALJ incorporated limitations that were consistent with those identified in Dr. Skory's April 7, 2004 report.

The Sixth Circuit has explained that the administrative regulations promulgated by the Defendant Commissioner establish a hierarchy of medical source evidence:

As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the [claimant] become weaker.

16

*Gayheart v. Commissioner of Social Security,* 710 F.3d 365, 375 (6th Cir. 2013) (internal quotation marks, alteration, and citations omitted). "The source of the opinion therefore dictates the process by which the Commissioner accords it weight." *Gayheart,* 710 F.3d at 376.

In this case, all are agreed that Dr. Skory qualifies as a "treating source" within the meaning of the governing Social Security regulation, 20 C.F.R. § 404.1527(c). Accordingly, his opinion "must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart,* 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)) (alteration in original). If, on the other hand, his opinion is not given controlling weight, then the ALJ was required to weigh his opinion "based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)). In addition, the ALJ must "provide 'good reasons' for discounting the weight given to a treating-source opinion." 710 F.3d at 376 (quoting § 404.1527(c)(2)).

17

In this case, the ALJ addressed Dr. Skory's April 7, 2004 opinion as follows:

> . . . [T]he claimant's treating physician, Mark L. Skory, D.O., opined in a report used for State disability benefits in April 2004 that the claimant's rheumatoid arthritis, anxiety disorder and alcoholism limited her to lifting [up] to ten pounds occasionally and standing, walking, and sitting up to three hours each in a day[,] as well as being unable to perform pushing or pulling. The undersigned finds that her limitations were at least the same prior to this opinion. The disability decision is reserved solely to the Social Security Administration Commissioner. The form does not contain any objective medical signs, symptoms or laboratory results corroborating the conclusion nor was a function-by-function assessment performed as part of the evaluation. This opinion also demonstrates a level of functioning greater than that alleged at the hearing. Therefore, this opinion was given some weight as it shows the claimant's prior limitations.

(AR at 23-24 (citations omitted).)

The Court acknowledges Plaintiff's point that the ALJ's discussion of Dr. Skory's opinion is, at the very least, not a model of clarity. As both sides agree, the ALJ's finding that Plaintiff's "limitations were at least the same prior to this opinion" poses an interpretive challenge, but the parties and the Court alike read this statement as meant to reflect the ALJ's determination that the limitations identified by Dr. Skory in April of 2004 were also present on Plaintiff's last insured date of December 31, 2003. Moreover, the ALJ's observation that "[t]he disability decision is reserved solely to the . . . Commissioner" appears to be a non

18

sequitur, where Dr. Skory did not opine in his April 7, 2004 report that Plaintiff was disabled.

Stripped of this surplusage, then, the ALJ's determination that Dr. Skory's opinion was entitled to "some weight" rests upon two grounds: (i) that the form completed by Dr. Skory "does not contain any objective medical signs, symptoms or laboratory results corroborating the conclusion[,] nor was a function-by-function assessment performed as part of the evaluation," and (ii) that Dr. Skory's opinion reflected "a level of functioning greater than that alleged at the hearing." (AR at 23-24.) The latter assertion, however, provides little if any basis for discounting Dr. Skory's opinion, where the ALJ had previously determined that Plaintiff was only "partially credible" in her testimony regarding her limitations. (*Id.* at 23.) Surely, then, the inconsistency between Dr. Skory's opinion and Plaintiff's testimony as to more significant limitations does not serve as a reason for according less weight to the opinion of a treating source.

This leaves only the ALJ's explanation that Dr. Skory's opinion was uncorroborated by any "objective medical signs, symptoms or laboratory results" and unaccompanied by a "function-by-function assessment." (AR at 23-24.) As noted, the pertinent Social Security regulation provides that the opinion of a treating physician is entitled to controlling weight only insofar as it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques."
20 C.F.R. § 404.1527(c)(2).  Here, in contrast, Dr. Skory did not complete the
portion of the form that called for "supporting data" and invited him to "[a]ttach
copies of supporting documentation."  (AR at 587.)  Similarly, in another portion
of the form calling for Dr. Skory to report any "pertinent abnormal findings," he
wrote, "See attached," (*id.*), but the record fails to reflect that he attached any such
evidence of abnormal findings to his report.  While Plaintiff speculates that Dr.
Skory's report might, in fact, have been accompanied by supporting materials, but
that these materials might have been stripped from the record as duplicative,
(Plaintiff's Reply Br. at 1), the Court sees no basis for disturbing the ALJ's finding
that the form submitted by Dr. Skory lacked the support of objective medical
evidence such as corroborative "signs, symptoms or laboratory results."  As the
Sixth Circuit has explained, "the ALJ is not bound by conclusory statements of
doctors, particularly where they are unsupported by detailed objective criteria and
documentation."  *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001) (internal
quotation marks and citation omitted).

Yet, even assuming the ALJ identified an appropriate basis for declining to
give controlling weight to Dr. Skory's opinion, this still leaves the question
whether the ALJ properly weighed this opinion in accordance with the factors

20

specified in § 404.1527(c)(2)-(6) and gave good reasons for determining that this treating source opinion was entitled only to "some weight."  At this step of an ALJ's assessment of the opinion of a treating source, it is not sufficient to inquire only whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2).  Rather, the ALJ must also consider "the length, frequency, nature and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart,* 710 F.3d at 376 (citing § 404.1527(c)(2)-(6)).

As Plaintiff observes, many of these relevant considerations would favor a finding that Dr. Skory's opinion was entitled to considerable weight.  He served as Plaintiff's treating physician for several years, including the time period of greatest relevance here, and he saw and examined Plaintiff frequently during this period.  In addition, the record contains a significant amount of objective medical evidence that  supports the limitations found by Dr. Skory, including x-rays, lab work, and the findings of a specialist in rheumatology, Dr. Maciulis, upon repeated examination of Plaintiff throughout the relevant period.  As noted by Plaintiff, Dr. Skory referred Plaintiff to Dr. Maciulis and his office notes occasionally refer to Plaintiff's treatment by this other physician, so it is

21

reasonable to assume that Dr. Skory's opinion was informed by the findings of Dr. Maciulis and the x-rays ordered by this specialist.

Under this record, there would appear to be scant basis for discounting the limitations found by Dr. Skory.  At a minimum, it can certainly be said that the ALJ failed to supply the requisite "good reasons" for discounting Dr. Skory's opinion, *see* 20 C.F.R. § 404.1527(c)(2), where his decision did not address any of the factors relevant to this inquiry, and where his statement that Dr. Skory's opinion was "given some weight" provides little guidance as to the precise weight given to this treating source opinion.  *See Gayheart,* 710 F.3d at 376 (explaining that the requisite "good reasons" under § 404.1527(c)(2) "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight" (internal quotation marks and citation omitted)); *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 246 (6th Cir. 2007) (noting that the "good reasons" standard "is directed to explaining not just why [treating] opinions do not warrant controlling weight, but should also explain what weight was given the treating opinions").

Nonetheless, these shortfalls in the ALJ's treating source analysis do not necessarily provide a basis for overturning the ALJ's decision.  In *Heston v.*

22

*Commissioner of Social Security,* 245 F.3d 528, 535 (6th Cir. 2001), for example, the challenged ALJ's decision failed to even mention a treating physician's "three-page summary of [the plaintiff's] medical history." The Sixth Circuit found that "[a]lthough the ALJ should have included a reference to the [treating physician's] report in [his] findings, the failure to do so, in this case, was harmless error." *Heston,* 245 F.3d at 536. In so ruling, the court pointed to the treating physician's admission in his report "that he had no current information on" the plaintiff, as well as his failure to provide any supportive medical records or "any objective basis for his conclusions." 245 F.3d at 535-36. In addition, the court observed that the hypothetical questions posed by the ALJ to the vocational expert at the administrative hearing incorporated many of the limitations identified in the treating physician's report, thus suggesting that the ALJ properly "considered [the] limitations described" in this report. 245 F.3d at 536.

For many of the same reasons identified in *Heston,* this Court concludes that the ALJ's flawed analysis of Dr. Skory's report was harmless error. First, as Plaintiff herself recognizes, the bulk of the medical evidence in support of Dr. Skory's opinion is found in the office notes of Dr. Maciulis and the x-rays ordered by this specialist. The ALJ expressly considered this evidence in determining Plaintiff's RFC, and in fact incorporated limitations into this RFC — *e.g.,* a

23

limitation to "frequent[]" handling, fingering, and feeling, (AR at 21) — that are not found in Dr. Skory's report, but instead were presumably derived from Dr. Maciulis's findings. Because the ALJ's decision reflects a thorough review of the entirety of the medical record, his perhaps overly dismissive treatment of Dr. Skory's April 7, 2004 report does not warrant reversal, particularly considering that this report, like the summary report at issue in *Heston,* consisted of conclusory findings without any discussion of, or even citation to, objective medical evidence from which these findings were derived.

Next, and more importantly, the Court fails to discern any significant inconsistencies between the limitations identified in Dr. Skory's April 7, 2004 report and the limitations imposed by the ALJ in determining Plaintiff's RFC. As in Dr. Skory's report, the ALJ determined that Plaintiff could lift up to ten pounds occasionally. (AR at 20, 588.) In addition, Dr. Skory opined that Plaintiff could intermittently stand, walk, and sit for two to three hours each per day, (AR at 588), while the ALJ found that she could "stand and/or walk up to six hours (with normal breaks) in an eight-hour workday and sit up to six hours (with normal breaks) in an eight-hour workday," so long as she could sit or stand "at will," (AR at 20). Although Plaintiff focuses on the lower bound of Dr. Skory's two-to-three-hour ranges, surmising that these limitations account for only six hours of an

24

eight-hour workday, the ALJ's findings were consistent with the upper bounds of the limitations identified by Dr. Skory, and also incorporated his "intermit[tent]" limitation by requiring that Plaintiff be allowed to sit or stand at will. Finally, the Defendant Commissioner observes that the ALJ's RFC determination was more restrictive than Dr. Skory's report in various respects, where the ALJ (i) limited Plaintiff to "frequent" handling, fingering, and feeling, while Dr. Skory imposed no such manipulative limitations, and (ii) incorporated a number of limitations — including only occasional stooping, kneeling, crouching, crawling, and climbing, occasional bending and twisting at waist level, no lifting from the ground to waist level, and no concentrated exposure to extreme temperatures, humidity and wetness, (AR at 20-21) — that are not found in Dr. Skory's report. Accordingly, as in *Heston,* this Court finds that the ALJ committed only harmless error in determining the weight to be given to Dr. Skory's report and identifying the reasons for this assessment, where the ALJ's overall analysis and consideration of the medical record overcame this deficiency by appropriately ensuring that the limitations stated in Dr. Skory's report and otherwise supported by medical evidence were reflected in Plaintiff's RFC.

**C.    Plaintiff Has Failed to Demonstrate Any Other Reversible Error in the ALJ's Decision.**

While Plaintiff devotes the bulk of her summary judgment motion to challenging the ALJ's treatment of Dr. Skory's report, her motion arguably appears to raise other arguments as well.  First, she faults the ALJ for failing to address the October 14, 2004 opinion of Dr. Penput Tangsintanapas.  As explained by the Defendant Commissioner, however, the ALJ did not commit reversible error in failing to discuss this opinion, because the opinion on its face is entitled to little, if any, probative value.  First, Dr. Tangsintanapas examined Plaintiff only once, and the Sixth Circuit has explained that the opinions of one-time examiners are entitled to "no special degree of deference."  *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).  Moreover, Dr. Tangsintanapas examined Plaintiff in October of 2004, ten months after Plaintiff's last insured date of December 31, 2003, so this physician's report necessarily is entitled to less weight in the ALJ's inquiry whether Plaintiff was disabled on or before her last insured date.

Next, Plaintiff appears to argue more generally that the ALJ's determination of her RFC is not supported by substantial evidence because it rests on a cherry-picked reading of the medical record, and especially the evidence of Plaintiff's treatment by Dr. Maciulis.  Having independently reviewed the ALJ's decision in light of this record, however, the Court is satisfied that the ALJ's findings are supported by substantial evidence in the record, and that the ALJ did not

26

improperly disregard any portion of this record.  While Plaintiff points to certain evidence in this record that is not expressly recounted in the ALJ's decision, the law is clear that an ALJ has no obligation to "directly address[] in his written decision every piece of evidence submitted by a party." *Kornecky,* 167 F. App'x at 508 (internal quotation marks and citation omitted).  Likewise, although Plaintiff argues that the medical record would support greater limitations than those found by the ALJ, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton,* 246 F.3d at 772.  Rather, the Court finds that the findings by the ALJ in this case fit within the "zone of choice" reflected in the "substantial evidence" standard of review.  *Buxton,* 246 F.3d at 773.

27

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's May 1,

2014 motion for summary judgment (docket #18) is DENIED, and that

Defendant's May 30, 2014 motion for summary judgment (docket #21) is

GRANTED.

s/Gerald E. Rosen
United States District Judge

Dated:  April 4, 2016

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on April 4, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135
